Filed 10/2/20  In re S.L. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.L. et al., Persons Coming Under the Juvenile Court Law. | B304423 (Los Angeles County Super. Ct. Nos. 19CCJP06870A 19CCJP06870B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> B.B., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Lisa A. Brackelmanns, Judge Pro Tempore.  Affirmed.

Deborah Dentler, under appointment by the Court of Appeal, for Defendant and Appellant B.B.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, appellant B.B. (mother) challenges the juvenile court's orders granting the father of her two daughters, C.L. (father), sole physical custody of their daughters and tie-breaking authority with respect to legal custody issues. Mother argues the juvenile court abused its discretion because its custody orders vary from a preexisting family law order and, therefore, necessarily violate mother's agreement to enter a no contest plea to the dependency petition below. Mother's argument is unsupported by both the appellate record and the law. Accordingly, we affirm.

## BACKGROUND

### 1. Mother and Father's Family Law Case

Prior to the instant dependency proceedings, mother and father shared joint custody of their two daughters, seven-year-old S.L. and five-year-old C.L. (daughters). The daughters stayed primarily with father, who lived in Apple Valley in San Bernardino County. Mother lived in Los Angeles.

In 2018, father sought to obtain full custody of daughters. Father explained mother and her boyfriend Jonathan H. had engaged in a serious domestic violence incident, during which mother "pulled a gun." After learning of that incident, father filed for custody of daughters in San Bernardino County family law court. In January 2019, the San Bernardino County family

2

law court issued an interim order denying father's request for sole physical custody and set the matter for an evidentiary hearing. The court's minute order (family law order) stated, "The existing time share the parties have been following shall remain in place." The family law order also required the maternal grandparents to supervise daughters "at all times" when in the presence of mother and Jonathan together. As of September 2019, mother and father's joint custody arrangement remained in effect.

Despite the shared custody agreement, daughters visited mother only a couple times a month because mother lived far from father. The daughters spent time with their maternal grandparents, who lived closer to father. Father had no concerns for daughters' safety when they were with mother alone but he expressed concerns for their safety if they were with mother and Jonathan together.

## 2. Events Preceding Dependency Petition

At the time these proceedings began, mother and Jonathan had been in a relationship for approximately 18 months, were living together, and had a seven-month-old son, J.S., together.[1] They also were business partners launching a honey water company.

Mother and Jonathan had a volatile relationship, involving numerous incidents of domestic violence. For example, in 2018, when mother was approximately nine weeks pregnant with J.S. she was arrested after she shot Jonathan, grazing his elbow,[2] and

---

[1] This appeal pertains to neither Jonathan nor J.S. We address facts related to them to the extent relevant.

[2] This was the 2018 incident that prompted father to file for sole custody of daughters.

in August 2019, law enforcement was called to their home following a physical altercation, during which Jonathan reportedly pulled mother's hair while she was holding J.S. and tried to strangle both of them.

The night of the August 2019 altercation, a referral was made to the Los Angeles County Department of Children and Family Services (Department). The next day a Department social worker spoke with mother at her home. Mother told the social worker she and Jonathan were arguing the night before because Jonathan believed mother was cheating on him. Jonathan became physical and, among other things, tried to strangle mother and squeezed the back of J.S.'s neck with two fingers. When mother told Jonathan to stop touching J.S., Jonathan applied more pressure to the child's neck and tried unsuccessfully to grab him out of mother's arms. Mother called the police and, by the time they arrived, Jonathan was gone. Paramedics checked J.S. at the scene and mother also took him to the hospital. He was reported to be fine, although mother said she and J.S. both had a few marks on their bodies after the confrontation.

Mother also told the Department social worker there had been previous incidents of domestic violence between mother and Jonathan. Mother explained she had not previously called law enforcement because Jonathan had never before touched J.S. Mother reported Jonathan was "very paranoid" and they usually fought when he accused her of cheating or taking his money. According to mother, prior to the August 2019 altercation, Jonathan had raped her multiple times; choked her several times; tried to suffocate her with a pillow; hit her head with a gun; hit and slapped her; pulled her hair, slammed her head into

the floor, or otherwise injured her many times; locked her in a bedroom for two days without food, liquids or a phone and raped her; and threatened to shoot himself and mother because mother allegedly cheated on him. Mother stated she previously had hit or kicked Jonathan and explained that in 2018 she accidentally shot him in the elbow during an argument when she was trying to leave the house. J.S. was present for some of the violent episodes. Daughters were present for some verbal arguments between mother and Jonathan and saw Jonathan throw a Christmas tree down the stairs. Mother also reported Jonathan used cocaine recreationally, which made him more paranoid.

Mother agreed daughters should not be around Jonathan and agreed to obtain a restraining order against Jonathan with J.S. as the protected person. The maternal grandmother told the social worker Jonathan was "a bully" and mother "always goes back to him."

The Department social worker met with Jonathan in October 2019. Jonathan admitted that during the 2018 incident when mother shot him, he had "slapped the shit out of her and told her to get the fuck out." He stated, "slapping mother was probably the wrong thing to do." Jonathan also stated mother was "crazy," threw things and "[b]lacks out" when angry, instigated the August 2019 altercation, and on other occasions purposely hurt herself and then told others he hurt her. Jonathan said he never touched J.S. or hurt him. He told the social worker he had not seen mother or J.S. since the August 2019 altercation. When asked about a recent business event he and mother had both attended in North Carolina, he replied they were both there but did not interact with one another.

In October 2019, the social worker again spoke with mother, who had been difficult to contact and refused to provide her current address.  Mother told the social worker she and Jonathan did not have a history of domestic violence and what she previously had said was untrue.  She said she lied before because "I thought he was going to leave me so it was a power trip."  She denied Jonathan had tried to choke J.S. during the August 2019 altercation and stated instead Jonathan "just grabbed the child from the back of his neck."  She said she and Jonathan did not want to resume their relationship and she had no restraining order in place.

In mid-October 2019, the juvenile court granted the Department's request for an expedited removal order detaining daughters from mother and J.S. from mother and Jonathan.  Daughters were placed with father and J.S. was placed with the maternal grandparents.

**3.    Petition and Detention**

On October 23, 2019, the Department filed a six-count Welfare and Institutions Code section 300 petition on behalf of daughters and J.S. (petition).[3]  The petition stated counts under subdivisions (a), (b) and (j) of section 300.  In particular, the petition alleged the children were at risk of serious physical harm due both to the ongoing domestic violence between mother and Jonathan and Jonathan's drug use.  Father was not named in the petition.

At the detention hearing held the next day, the juvenile court ordered daughters detained from mother and released to father.  The court granted mother monitored visits with

---

[3] Undesignated statutory references are to the Welfare and Institutions Code.

daughters and ordered Jonathan not to have any contact with daughters.

**4.      Adjudication, Disposition, and Termination of Dependency Jurisdiction**

        a.      *Further Investigation and Recommendations*

Prior to adjudication, the Department continued its investigation. A Department social worker spoke with mother. Mother said she was living with a friend at the time but did not give the address. Mother told the social worker she did not want to be in a relationship with Jonathan but hoped they could co-parent J.S. Mother also said she did not want a restraining order against Jonathan because she had to communicate with him for work. She had, and only wanted, a stay away order. Mother also offered more details of the many instances of domestic violence between her and Jonathan, which started soon after they began dating and living together in March 2018. Mother downplayed Jonathan's cocaine use, stating it was "just an 'LA' thing and not a habit." As to daughters, mother told the social worker she was "in favor of the girls remaining with their father and having their DCFS and Dependency case closed. She reported she would continue to visit with the girls and abide by the visitation order."

The social worker also spoke with father. He explained he had allowed—in violation of the family law order—daughters to visit mother in Los Angeles for unmonitored overnight visits during the summer 2019. He said mother had been too busy to come to them so he let them stay with her. He indicated he understood he should not have allowed their visits to be unmonitored. Father stated he did not know whether mother was able to stay away from Jonathan. Father believed the dependency case should be closed as to daughters because he was

protective and they did not need Department services or supervision.

The social worker also interviewed maternal grandmother, with whom J.S. was placed. Maternal grandmother told the social worker mother visited multiple times a week but would not tell maternal grandmother where she was living. Maternal grandmother stated the longest time mother had stayed apart from Jonathan was three weeks, stating, "I don't know why she goes back. It's like a fatal attraction between the two." She said mother tried to hide her injuries from the domestic violence, but on more than one occasion maternal grandmother saw bruises on mother's body. Maternal grandmother believed the dependency case should be closed and father granted custody of daughters.

Finally, the social worker spoke with the Department social worker who first had worked on the case. That social worker reported mother had said she wanted to recant her allegations against Jonathan in order to get her children back. The social worker believed mother and Jonathan minimized the seriousness of their domestic violence, which the social worker believed was "extreme and scary."

On November 26, 2019, the Department filed its jurisdiction and disposition report with the juvenile court. In its report, the Department stated, "Mother and [Jonathan] minimize their extensive and violent history of domestic violence and fail to recognize how their actions, including verbal and physical altercations, exposed the children to an unhealthy environment with high levels of stress that posed a threat to the immediate physical safety and emotional wellbeing of the children." As to daughters, the Department recommended the juvenile court declare daughters dependents of the court, terminate jurisdiction

as to them, and issue a family law order granting father sole physical custody, mother and father joint legal custody, and monitored visitation for mother. It was also recommended Jonathan have no contact with daughters.

In a December 2019 last minute report for the court, the Department noted its concern that mother remained in a relationship with Jonathan. Mother refused to provide the Department with her current address and continued to be in a business relationship with Jonathan. In addition, mother had told a Department social worker Jonathan's mother was moving to Los Angeles to take care of J.S. and mother planned to live with her. Maternal grandmother also believed mother was still in a relationship with Jonathan or at least violating the stay away order. Maternal grandmother said when she spoke with mother on the phone, she could hear Jonathan in the background. By January 7, 2020, Jonathan's mother had moved to Los Angeles and mother was living with her.

In a January 2020 report, the Department stated mother recently had forced her way into the maternal grandparents' home, tried to physically assault them, called them vulgar names, and cursed at them. Mother blamed the maternal grandparents for the fact the juvenile court had not returned the children to her care. After the incident at their home, the maternal grandparents requested visits with J.S. occur in a public setting (although, eventually, they worked out their differences sufficiently that mother resumed visits at the home). The maternal grandparents also told a Department social worker "mother is still in a relationship with [Jonathan] and that they are actively violating the restraining order." Maternal grandfather also revealed Jonathan told him in December 2019

9

that he and mother had another physical and verbal altercation, during which mother threw and hit Jonathan and his car with a container of orange juice.

Around the same time, mother contacted a Department social worker to complain about the maternal grandparents. In contrast to what the maternal grandparents had reported, mother told the social worker maternal grandmother had "attempted to come at her physically." Mother said she would rather have J.S. placed in a foster home than live with the maternal grandparents. Mother also said she was participating in a domestic violence group and counseling. The Department attached letters from mother's programs to its report to the court.

In its January 2020 report, the Department also noted its "concerns about any possible progress mother could be making in her programs considering she is still in a relationship with [Jonathan], but denying this to [the Department]. Further, the last that the Department knew, there is a restraining order between mother and [Jonathan], which the Department is aware that mother and [Jonathan] actively violate. In addition, the Department has learned of at least one physical altercation that occurred between mother and [Jonathan] [in December 2019], which is concerning since mother is reportedly attending domestic violence counseling." The Department also noted Jonathan had "yet to make contact with" Department social workers.

In its January 2020 report, the Department repeated its November 2019 recommendation as to daughters. Namely, the Department recommended the juvenile court declare daughters dependents of the court, terminate jurisdiction as to them, and issue a family law order granting father sole physical custody,

10

mother and father joint legal custody, and monitored visitation for mother.

### b. *Hearing*

The adjudication hearing was held on January 16, 2020, at which time the juvenile court announced the parties had reached an agreement. The court stated, "All right. We have an agreement reached between the parties. This was set for an adjudication. [¶] I have the waiver of rights juvenile dependency forms for [Jonathan] and [mother]." In addition to waiver of rights forms, mother and Jonathan each filed a plea of no contest to the petition. The juvenile court found mother and Jonathan understood "the nature of the conduct alleged in the petition and the possible consequences of their pleas." In its minute order from the hearing as to daughters, the court held mother's waivers were "knowingly, intelligently and voluntarily made" and "[a]ll counsel join in the plea and waivers and stipulate to the courts [*sic*] finding that there is a factual basis for said plea." Neither the waiver of rights, plea of no contest, written agreement between the parties (to the extent there was one), nor description of the parties' agreement is in the record on appeal.

The juvenile court dismissed counts a-2, b-1, b-2, and the subdivision (j) count, and sustained the remaining subdivision (a) and (b) counts as amended. The sustained counts concerned the unresolved history of domestic violence between mother and Jonathan and Jonathan's drug use. The court declared daughters dependents of the court, removed them from mother, and released them to father.

The court then addressed termination of its jurisdiction and entry of a custody order as to daughters. Although counsel for all parties agreed the court should terminate jurisdiction, counsel

11

disagreed as to the resulting custody arrangement. Counsel for the Department argued the juvenile court should terminate jurisdiction and enter a family law order granting sole legal and physical custody of daughters to father and monitored visits for mother. Although counsel for mother agreed the juvenile court should terminate its jurisdiction, mother's counsel urged the court "to revert back to the original family law order, which was joint, joint between the parents." Mother's counsel added, however, "At the very least, we would like the joint legal to stay in place. There's no evidence that these parents can't work together; that mother has done anything that shouldn't warrant her ability to make decisions for these girls." Counsel for father argued father should be given sole physical custody of daughters, but father was "okay with joint legal" custody of daughters. Counsel for the children joined in the Department's request that the court grant sole physical and legal custody to father but stated joint legal custody would be acceptable if father were granted tie-breaking authority.

Over mother's objection, the juvenile court ordered sole physical custody of daughters to father and, over the Department's objection, ordered joint legal custody with father having tie-breaking authority. Mother's counsel twice raised her objection to the order, stating, "that is a change in the original family law order." The court noted mother "can go back to the family law court and modify that, but the court is going to order terminating jurisdiction with the family law order of joint legal, sole physical to the father; monitored visits with the mother, but [Jonathan] is not to be present during those visits with the . . . children." As to mother's objection, the juvenile court explained "there are intervening events that have occurred since the

12

original family law order."  The court also ordered no contact between Jonathan and daughters.

The next day, January 17, 2020, the juvenile court terminated its jurisdiction and entered the family law order consistent with its orders entered the previous day.

## 5. Appeal

Mother appealed the juvenile court's January 16, 2020 orders.

## DISCUSSION

Mother challenges the juvenile court's dispositional orders, arguing the court abused its discretion when, over mother's objection and allegedly without evidentiary analysis, it granted father sole physical custody and tie-breaking authority as to legal custody issues.  Mother claims her "voluntary out-of-court agreement with the parties . . . was intended by all parties to resolve both jurisdictional and dispositional matters, and then [the juvenile court] made dispositional orders (custody and visitation orders) that the parties did not contemplate when Mother agreed to waive her trial rights.  Her waiver and 'no contest' plea were conditioned on the reinstatement or reissuance of the terms of the previous family law orders."  Mother's position is not supported by the record or the law.

## 1. Applicable Law and Standard of Review

At the disposition hearing, "the juvenile court enjoys wide discretion to make any orders necessary to protect the dependent child (§ 361, subd. (a)), including 'all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child' (§ 362, subd. (a)) and those orders directed to the parents of a dependent child that it 'deems necessary and proper for the best interests of or for the rehabilitation of the minor'

13

(§ 245.5). That authority necessarily includes, in an appropriate circumstance, discretion to terminate dependency jurisdiction when the child is in parental custody and no protective issue remains." (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 207.)

"[W]hen a court has made a custody determination in a dependency proceeding, ' "a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Id.* at pp. 318–319.)

## 2. No Error

We cannot agree with mother's position on appeal. First, the appellate record simply does not support mother's claim she conditioned her waiver of rights and no contest plea on the juvenile court reinstating or reissuing the family law order. The parties' out-of-court agreement is not in the appellate record and no one described the agreement on the record at the January 2020 hearing. Thus, we do not know for example whether the parties' agreement addressed disposition orders or whether mother conditioned her agreement on such unidentified orders. At the disposition hearing, mother's counsel objected to the juvenile court's custody orders because they conflicted with the family law order. Mother's counsel never stated or implied the court's custody orders conflicted with the parties' agreement. In fact, mother's counsel indicated mother would be amenable to father having sole physical custody if joint legal custody

14

remained. In addition, almost two months before the adjudication and disposition hearing and again just before the hearing, the Department's reports to the court clearly stated the Department's recommendation that father be granted sole physical custody of daughters. Thus, it is not reasonable to believe mother or her counsel was surprised when the juvenile court considered and then ordered sole physical custody to father. As such, mother's argument on appeal finds no support in the record.

Second and similarly, it is unreasonable to suppose, as mother argues we should, that she "obviously would not have knowingly relinquished her right to a contested hearing had she known the court would change the previously-existing family law custody orders." By pleading no contest, mother submitted to the juvenile court's jurisdiction based on true findings her children were at risk due to her unresolved and serious history of domestic violence with Jonathan. Although possible, it is far from a foregone conclusion that after making its jurisdictional findings the juvenile court would then terminate its jurisdiction and order the family back to the status quo—a status quo that included shared physical custody of daughters. (See *In re Destiny D.*, *supra*, 15 Cal.App.5th at p. 211 ["[I]t will be an unusual case when protections imposed at disposition will be sufficient to permit the conclusion that termination is appropriate. It will be rarer still for a juvenile court to reach that conclusion when the parent with whom the child remains has been found to be an offending parent."].)

Finally, the juvenile court did not abuse its discretion in making its custody orders. The court stated its custody orders were based on "intervening events" that occurred after the family

15

law order was entered.  Although the juvenile court did not itemize the intervening events it had in mind, the record contains clear and substantial evidence of such events, not the least of which is the fact the juvenile court declared daughters dependents of the court based in part on mother's conduct. Additionally, following entry of the family law order, mother and Jonathan admittedly engaged in domestic violence incidents, one of which occurred the month before the adjudication and disposition hearing and months after the children had been removed from mother's care.  Similarly, during the investigation below, mother described multiple incidents of serious domestic violence that do not appear to have been before the family law court.  Moreover, assuming the parties had agreed to a particular set of disposition orders, mother cites no authority for her assertion the juvenile court lacked discretion to diverge from such an agreement.  We conclude the juvenile court did not abuse its discretion in making its custody orders.

Finally, we are not persuaded by mother's reliance on *In re Michael W.* (1997) 54 Cal.App.4th 190, where Division One of this district reversed the juvenile court's order terminating jurisdiction and ordering physical and legal custody to the father. There, before terminating jurisdiction and making its custody orders, the juvenile court refused to hold an evidentiary hearing, twice denying the mother's requests for such a hearing.  (*Id.* at p. 193.)  In contrast here, and as mother admits, mother did not request an evidentiary hearing below and, in any event as the Department notes, the juvenile court did receive evidence of mother's participation in a domestic violence group and counseling.  As discussed above, the record here amply supports the juvenile court's rulings based on "intervening events."

## DISPOSITION

The January 16, 2020 orders are affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

ASHMANN-GERST, J.

CHAVEZ, J.

17